UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BUSS CHEMTECH AG,

Plaintiff,

v.

PCS PHOSPHATE COMPANY, INC.,

Defendant.

**COMPLAINT**

Index No. 25-cv-3710

Plaintiff Buss ChemTech AG ("Buss"), by and through its undersigned counsel, brings this action against Defendant PCS Phosphate Company, Inc., ("PCS"), and alleges as follows:

## NATURE OF THE ACTION

1. This case arises from a contractual dispute between Buss and PCS over the use of Buss's proprietary technology and equipment in a plant to produce anhydrous hydrogen fluoride in North Carolina (the "AHF Project"). The governing contract, the Engineering, Procurement and Field Support Services Agreement, dated September 3, 2019 (the "Agreement"), sets forth the services that Buss provided to PCS as part of the AHF Project. The Agreement, which was negotiated between these two sophisticated parties, contains an explicit limitation on Buss's liability and calls for New York courts, including this Court, to hear any disputes between the parties. Yet, despite these clear contractual provisions and Buss's completion of its obligations under the Agreement (without any prior complaints or objections by PCS), PCS has filed an improper lawsuit against Buss in North Carolina seeking hundreds of millions of dollars in damages beyond the liability cap in the Agreement. Hoping to skirt the contractual obligations (and limitations) that it negotiated with Buss years ago in order to make Buss a scapegoat for its

own failings, PCS is asking a court in its home state to overlook the clear language of the Agreement and award PCS damages it is not owed by Buss. But the parties' dispute belongs here, in the Southern District of New York, and this Court should not countenance PCS's gamesmanship and forum shopping. Instead, this Court should find that Buss fulfilled its obligations under the Agreement and that PCS—not Buss—breached the parties' Agreement.

2. Under the carefully constructed Agreement, Buss's obligations were limited. Specifically, the Agreement states that Buss will (i) provide PCS the right to use Buss's proprietary process technology, along with the technical specifications integral to that technology; (ii) supply a specific and limited set of proprietary equipment essential to Buss's technology; (iii) furnish on-site installation assistance exclusively related to this proprietary equipment; and (iv) assist PCS during the commissioning, start-up, and performance-testing phases of the AHF Project.

3. PCS, for its part, assumed responsibility for all other aspects of the AHF Project—including (i) detailed engineering and design incorporating Buss's proprietary materials and specifications; (ii) designing, procuring, supplying, and constructing all non-proprietary materials and equipment; (iii) fully erecting, commissioning, starting up, and maintaining operational control of the plant; and (iv) comprehensive management and oversight of the AHF Project. To the extent that any overlap existed between Buss's limited work and PCS's broader obligations, responsibility rested exclusively with PCS.

4. Because Buss's role on the AHF Project was limited in nature, and because Buss is a relatively small Swiss company, the parties agreed that the cap on Buss's potential liability would be no more than 4.6 million Swiss Francs (approximately $5.4 million). The total contract price, by comparison, was only 9.58 million Swiss Francs (approximately $11.6 million), and the AHF Project as a whole was to cost over $150 million.

5. PCS's improper attempt to use the North Carolina courts for its manufactured lawsuit directly contravenes the Agreement, in which the parties agreed that "[a]ll disputes arising out of or in connection with this Agreement shall be finally settled in the State of New York or the United States District Court for the Southern District of New York." That provision was heavily negotiated by the parties, with Buss—a Swiss company—originally proposing arbitration and PCS proposing North Carolina courts as the appropriate dispute-resolution venue. Given their differing proposals, the parties compromised, agreeing that New York courts would hear all disputes under the Agreement. PCS wants now to renege on this negotiated provision. But the Agreement's clear and explicit language should govern here. Furthermore, to the extent PCS actually believed that North Carolina courts had jurisdiction to hear the parties' dispute when the Agreement was signed, PCS misled Buss into signing the Agreement.

6. The reality is clear based on all of the above. PCS stumbled repeatedly in getting the AHF Project completed and fully functional, causing years of self-induced delays and disruptions. Rather than owning up to its own mistakes and troubles, PCS has filed suit in the wrong forum, seeking damages that far exceed the parties' explicitly agreed-upon contractual liability cap.

7. Because of this forum shopping, Buss asks this Court—the proper jurisdiction under the Agreement—to enter declaratory judgments pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, confirming Buss did not breach the Agreement and, separately, that PCS cancelled the Agreement for convenience. Buss also seeks a declaration that the Agreement limits Buss's liability to 4.6 million Swiss Francs and that, under the Agreement, Buss is not liable for PCS's lost profits and consequential damages. Buss further asserts claims for breach of contract,

fraudulent misrepresentation, and negligent misrepresentation arising from PCS's past and ongoing lies and omissions concerning performance of its contractual obligations.

## PARTIES

8. Buss is a Swiss company with its principal place of business in Pratteln, Switzerland.

9. PCS is a Delaware corporation with its principal place of business in North Carolina.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), because this action is brought by a citizen of a foreign state against a citizen of a state within the United States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.

11. Venue is proper in this District pursuant to 28 U.S.C. §1391 because this action arises out of a contract pursuant to which the parties agreed to submit to the jurisdiction of the United States District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

### I. The Parties Negotiated the Agreement, Which Specifically Delineates the Parties' Rights and Obligations

12. Buss is an established chemical process technology provider with more than six decades of experience in proprietary methods for producing anhydrous hydrogen fluoride ("AHF"), an industrial compound used in refrigerants, light bulbs, herbicides, and pharmaceuticals, among other things.

13. PCS produces acids for various industrial and agricultural applications at its Aurora, North Carolina, facility. Interested in converting fluorosilicic acid—a byproduct of its

existing operations—into commercially valuable AHF, PCS approached Buss to license Buss's proven technology and integrate it into PCS's operations.

14. The relationship between Buss and PCS began in 2016, when the parties performed an on-site feasibility assessment per an executed purchase order. They signed an initial agreement in late 2017 and Buss delivered its work under that agreement, with PCS indicating in a customer-satisfaction interview conducted in March 2018 that it appreciated Buss's work and cooperation.

15. Satisfied with Buss's prior work for PCS and after a long evaluation of different process technologies and plant design variations, in 2019, PCS selected Buss's AHF technology and asked Buss to perform work for the AHF Project. To that end, the parties further discussed a limited scope of work Buss would perform and, on September 3, 2019, Buss and PCS signed the Agreement, defining each party's roles and responsibilities for the AHF Project.

16. A true and correct copy of the Agreement is attached as Exhibit 1. The Agreement also contains its own exhibits, including Exhibits A & B (titled "Technical Specifications") and Exhibit C (titled "Performance Guarantees"). A true and correct copy of the General Terms and Conditions, which the parties incorporated into the Agreement, is attached as Exhibit 2 (titled "Terms and Conditions").

**A. The Parties' Obligations Under the Agreement**

17. Under Section 5.1 of the Technical Specifications of the Agreement, Buss's role and obligations on the AHF Project were limited to the following:

(1) Buss would grant PCS the right to use Buss's proprietary process technology and would provide PCS with basic engineering—that is, the technical specifications integral to the implementation of that technology;

(2) Buss would supply a specific and limited set of proprietary equipment essential to Buss's process, as explicitly defined in Section 17 of the Agreement ("Proprietary Equipment");

(3) Buss would provide targeted on-site installation assistance related to the Proprietary Equipment; and

(4) Buss would assist PCS during commissioning, start-up, and performance testing of the plant (the "Start-Up and Performance Tests"), consistent with the procedures defined in the Agreement.

18. Under Section 5.2 of the Technical Specifications of the Agreement, PCS assumed responsibility for everything else, including:

(1) PCS would design the detailed engineering of the plant, incorporating Buss's technology specifications and Proprietary Equipment;

(2) PCS would procure, supply, and construct all equipment, utilities, infrastructure, and materials not identified as Proprietary Equipment;

(3) PCS would engage in overall project management and oversight; and

(4) PCS would fully erect, commission, and start up the plant, as well as operate and maintain it.

19. Buss was required to design its work such that it would comply with various standards and regulations, including the Federal Occupational Safety and Health Act. Terms and Conditions at §5(A). But because Buss's responsibilities were limited to basic engineering and PCS's responsibilities included detailed engineering, Buss was *not* responsible for "checking and verif[ying]" drawings, bills of material, specifications, and other engineering documents prepared

by PCS; nor was Buss responsible for the engineering, design, procurement, or construction of non-proprietary equipment. Technical Specifications at §17.9; *supra* ¶¶17–18.

20. The Agreement also included other carefully negotiated provisions—specifically, performance guarantees, mechanical warranties, a cancellation-for-convenience clause, limitations on liability and damages, as well as forum-selection and choice-of-law clauses—all of which further defined and constrained each party's respective rights and obligations.

**B. Performance Guarantees**

21. The Agreement included Performance Guarantees regarding Buss's deliverables.

22. Buss guaranteed that the AHF Project, when constructed and operated according to Buss's specifications and under conditions prescribed by Buss, would achieve certain AHF production rates, which were required to be demonstrated during Start-Up and Performance Tests. Performance Guarantees at §§A, B.

23. PCS would carry out the Start-Up and Performance Tests during the Commissioning Period. Technical Specifications at §19.2.3. PCS would also carry out the Start-Up and Performance Tests, "insofar as required with the advice and guidance of [Buss's] staff," with the results analyzed by both parties. Technical Specifications at §19.2.4.

24. The Agreement also provides that "[PCS] shall invite [Buss] to these tests; otherwise all of [Buss's] guarantees become null and void." Technical Specifications at §§19.2.3, 19.2.4.

**C. Mechanical Warranties**

25. The Agreement also included limited mechanical warranties on Buss's Proprietary Equipment.

26. Buss warranted, as relevant here, that it would repair or replace, at its own cost, any defective Proprietary Equipment if PCS observed defects within 18 months following delivery of the equipment. Additionally, Buss further warranted any remedial or corrective repairs for 12 months following completion of such remedial work. Agreement at §2(b).

27. However, "should significant repairs and/or alterations of the [Proprietary Equipment] be carried out by [PCS] without [Buss's] written consent," "[t]he mechanical warranty period expires immediately." Technical Specifications at §20(d).

**D. Cancellation-for-Convenience Clause**

28. The Agreement further permitted PCS to cancel the Agreement at its convenience.

29. Section 14 of the Agreement provides that PCS could, at any point during the duration of the Agreement, cancel the Agreement on written notice to Buss. Agreement at §14.

30. In the event PCS opted to cancel the Agreement for convenience, all rights and obligations relating to unperformed services would be disallowed. Agreement at §14.

**E. Limitations on Liability and Damages**

31. The Agreement includes various sections regarding the parties' potential liabilities and damages.

32. Section 16 expressly limits Buss's total potential liability to PCS, with a cap of 4.6 million Swiss Francs:

> With respect to the performance of the Services hereunder, the total liability of [Buss] to PCS Phosphate for all claims of PCS Phosphate under, arising out of or in connection with this Agreement (including non-fulfilment of Performance Guarantees as referred to

> [in] Section 3 and cost to remedy defects as stipulated on Section 2) whether such claims are made in contract, tort (including negligence), for breach of statutory duty or otherwise, shall not exceed in aggregate the maximum amount of CHF 4'600'000.

Agreement at §16.

33. In addition, Section 36 expressly limits PCS's damages, disallowing lost profits and other consequential damages:

> [I]n no case shall neither party be liable for contingent or consequential or other indirect damages including, without limitation, damages for loss of use, revenue, profit or product, operating costs, financing and interest costs and business interruption, however the same may be caused, including, without limitation, the fault, breach of contract, tort (including the concurrent or sole and exclusive negligence), strict liability or otherwise of the other party.

Agreement at §36.

### F. New York Forum-Selection and Choice-of-Law Clauses

34. The Agreement provides that any dispute arising under the contract shall be "governed by New York law" and "settled in the State of New York or the United States District Court for the Southern District of New York." Agreement at §21(b).

35. Indeed, the history of the parties' negotiations shows that the New York forum-selection and governing-law clauses were heavily negotiated, ensuring that neither party would have home-court advantage.

36. PCS sent Buss a first draft of the contract that ultimately became a prior executed version of the Agreement that the parties entered into in October 2017, and that contains similar language to the 2019 Agreement at issue here. The draft of the 2017 Agreement that PCS proposed provided that any dispute be governed by North Carolina law and adjudicated in North Carolina. Buss countered PCS's draft, proposing that English law should govern any dispute, with Swiss

arbitration under United Nations Commission on International Trade Law rules. Ultimately, the parties chose a neutral forum and law for the 2017 Agreement—that is, New York courts applying New York law. Agreement at §21(b).

37. The 2019 Agreement retained the 2017 Agreement's choice-of-law and choice-of-venue provision. Thus the parties bargained for, and settled on, New York as a neutral site for any dispute.

## II. The Parties' Performance Under the Agreement

38. Buss began performing under the Agreement immediately after execution. Buss promptly delivered to PCS the agreed-upon proprietary technical specifications and supplied the limited set of Proprietary Equipment.

39. Buss advised PCS that successful execution of PCS's extensive contractual responsibilities would require an experienced and proven engineering, procurement, and construction ("EPC") contractor for the AHF Project. To that end, Buss recommended WengFu, an EPC contractor and plant operator that had already successfully applied Buss's technical specifications and installed the Proprietary Equipment in five AHF plants in China.

40. PCS rejected Buss's recommendation. PCS represented that it regularly executes large projects across the United States and maintained relationships with many qualified contractors capable of effectively performing the substantial engineering and procurement work that was required for a project of this type.

41. Having rejected Buss's recommendation for a single EPC contractor, PCS instead decided to fragment the EPC responsibilities among a patchwork of different companies, including Jacobs Engineering Group, Inc. ("Jacobs"), Roberts Company, RECO NC, and other vendors and subcontractors. Of course, by scattering EPC responsibilities among a bevy of vendors and

subcontractors, PCS assumed the burden—and, indeed, the risk—of coordinating and shepherding these disparate entities into alignment over the course of the AHF Project.

42. After delivering the technical process specifications and supplying the Proprietary Equipment, Buss began providing the on-site assistance for proper installation of the Proprietary Equipment. The AHF Project, like any large-scale technical project, required troubleshooting, and Buss was always willing to look for solutions even where the issues at stake were not part of Buss's scope of work or responsibility.

43. In one instance, the project's silicon tetrafluoride generator had an acid-mixing device connected to PCS's pre-existing generator equipment, which had a faulty design. Buss incorporated the generator in its design because PCS requested that Buss use it. Buss proposed and delivered new mixing tubes submerged in the generator itself, even though the tubes were not part of the Proprietary Equipment to be delivered by Buss.

44. In another instance, PCS had the silica filters installed in a building where it was too hot for the material of construction ("MoC") to keep mechanical integrity, resulting in sagging and deformation. Although the building's design and temperature were not Buss's responsibility, Buss, together with its supplier, BHS, and the Nutrien materials team, ultimately fixed the problem largely at the expense of Buss and its supplier.

45. In a third instance, the hydrogen fluoride boiler material (for which Buss provided the specifications, but not the boiler material itself), turned out to be inadequate for the high-temperature steam PCS initially used. Because high-temperature steam is not required for the hydrogen fluoride boiler, Buss recommended using hot water instead, which resolved the issue.

46. And in a fourth instance, the thermowells (protective tubes for the temperature probes) installed in critical sections of the plant—and engineered and purchased by PCS and

Jacobs—corroded and led to plant downtime. Although not within Buss's responsibility, Buss proposed a new corrosion-resistant type of MoC together with a potential supplier, even doing corrosion tests at Buss's own expense, to show suitability of the new MoC in this highly corrosive environment.

47. Other than these minor, temporary issues, PCS did not issue any formal notice of defect, deficiency or failure to Buss concerning the Proprietary Equipment within 18 months of its delivery as required by the Agreement. When issues were raised by PCS, Buss immediately offered to remedy each one. And with each fix, PCS did not thereafter inform Buss of any defect or failure related to Buss's remedial or corrective work during the 12 months that followed, as required by the Agreement.

48. Notably, PCS's pre-Agreement praise of Buss and its work continued over the course of the Agreement. On April 16, 2020, for example, Buss's Business Manager conducted a new customer-satisfaction interview with PCS's Director of Project Management Engineering. As it did in the previous customer-satisfaction interview, PCS expressed its appreciation for Buss's work. Specifically, PCS cited Buss's responsiveness, quality of documentation, support (either by meetings in person or remotely during pandemic lockdown), communication, and competence. PCS also praised Buss's patience during negotiation and its support in reengineering work.

49. On July 15, 2023, PCS decided to end Buss's on-site role and further determined that PCS would manage the AHF Project on its own, though Buss would remain ready and available to provide remote support if PCS needed it. Though Buss's involvement in the AHF Project had come to a close before the commissioning, start-up, and performance-testing phases, the parties parted on good terms.

50. On information and belief, although PCS has engaged in Performance Tests and Start-Ups of the AHF Project, PCS has invited Buss to none of them.

51. Also, on information and belief, PCS has, since Buss's departure from the site, completed significant alterations to the Proprietary Equipment—all without Buss's written authorization.

52. And notwithstanding its assertion that it was ready to manage the AHF Project on its own, PCS has repeatedly returned to Buss over the past two years, seeking additional parts, materials, and technical assistance falling outside the scope of the Agreement. Buss has promptly and willingly provided PCS with the requested support each time. In fact, PCS has continued to request materials and assistance from Buss at the same time that it now pretends that Buss breached the Agreement.

53. Notably, throughout the entire contractual relationship—and despite the suggestion created by PCS's present litigation position—PCS never has disputed a payment owed to Buss under the Agreement. Indeed, PCS paid Buss every dollar due under the Agreement without objection or delay.

**III. The Parties' Current Dispute**

54. On November 13, 2024, PCS sent Buss a demand letter and notice of dispute. The demand letter alleges breaches of contract against Buss and Jacobs collectively (without any distinction of what each entity allegedly failed to do).

55. Despite the Agreement's explicit liability limitation of CHF 4'600'000 (approximately $5,400,000), the demand letter alleged *over $140 million* in damages. And despite

the Agreement's explicit preclusion of lost profits and consequential damages, the demand letter alleged $52.5 million in lost profits.

56. As required by the Agreement, the parties met and conferred in December 2024 in New York City regarding PCS's demands, but were not able to resolve the dispute.

57. On February 28, 2025, PCS sued Buss in North Carolina state court, despite the forum-selection clause that the parties had heavily negotiated and mutually agreed to.

58. PCS brought claims in North Carolina for breach of contract, breach of warranty, negligent misrepresentation, and professional negligence against both Buss and Jacobs. The complaint, like the demand letter, does not differentiate between PCS's allegations against Buss and Jacobs.

59. As of the filing of this complaint, PCS has not served Buss with the petition and summons associated with the North Carolina dispute.

**FIRST CAUSE OF ACTION**

**Declaratory Judgment – No Breach of Contract, Cancellation for Convenience, and Limitation on Liability and Damages**

60. Buss incorporates the allegations in the foregoing paragraphs.

61. Pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, Buss seeks the following declarations from the Court related to the Agreement:

a. Buss satisfied the mechanical warranties and Performance Guarantees; in the alternative, the mechanical warranty period expired immediately upon PCS altering or repairing the Proprietary Equipment without Buss's written authorization, and the Performance Guarantees are null and void because PCS failed to invite Buss to the Start-Up and Performance Tests.

b. PCS's decision that Buss would cease work on the site constitutes a cancellation for convenience under the Agreement and, therefore, PCS retained no rights and Buss

maintained no obligations relating to unperformed services, including Performance Guarantees, which were contingent upon Buss's participation in the Start-Up and Performance Tests.

c. In the event of any breach (which Buss contends did not occur), its liability "under, arising out of or in connection with th[e] Agreement," whether "in contract, tort (including negligence), for breach of statutory duty or otherwise," cannot "exceed in aggregate the maximum amount of CHF 4'600'000." Buss further seeks a declaration that PCS is not entitled to any lost profits and consequential damages under the Agreement.

62. Because PCS has alleged violations of the Agreement and significant damages (including lost profits associated with the intended sale of AHF and other consequential damages) in excess of the explicit contractual cap—and has done so in North Carolina (in violation of the Agreement's forum-selection clause)—there is a substantial, justiciable controversy between Buss and PCS sufficient to warrant a declaratory judgment of Buss's and PCS's rights and obligations. The actual and imminent injury threatened by PCS's actions include, among other things, that Buss may be subjected to a judgment in a jurisdiction other than the one it bargained for and agreed to.

63. Accordingly, Buss respectfully seeks the declarations set forth above.

## SECOND CAUSE OF ACTION
**Breach of Contract**

64. Buss incorporates the allegations in the foregoing paragraphs.

65. When Buss and PCS negotiated the Agreement, they mutually bargained for, and agreed upon, New York as the appropriate forum for any disputes related to the Agreement.

66. PCS filed suit in North Carolina, in direct breach of the Agreement.

67. As a result, Buss has been damaged by having to expend resources preparing to defend litigation in a jurisdiction other than that in which the parties agreed to litigate.

**THIRD CAUSE OF ACTION**
**Fraudulent Inducement**

68. Buss incorporates the allegations in the foregoing paragraphs.

69. During contract formation, PCS made certain material misrepresentations.

70. Buss suggested that PCS work with WengFu as EPC contractor based on WengFu's prior success in applying Buss's technical specifications and installing the Proprietary Equipment in AHF projects.

71. PCS declined to follow Buss's recommendation to select WengFu as EPC contractor.

72. PCS represented to Buss that it had a selection of EPC companies with which it had extensive experience for a project of this type.

73. PCS's representation was false; in fact, none of the EPC companies selected had extensive experience with the technology and engineering required for a project of this type.

74. PCS knew, based on its previous experience with the EPC companies, that its representation regarding the EPC companies was false at the time PCS made such representation, and intended that Buss rely on the representation in deciding to enter the Agreement. Buss relied on PCS's representation regarding EPC companies: Buss understood PCS's representation to be an assurance that the EPC contractor or contractors PCS selected would be competent and capable of working successfully with Buss's technical specifications and Proprietary Equipment, and PCS's representation was a material factor in Buss's decision to contract with PCS. Buss would not have entered into the Agreement with PCS without PCS's assurances regarding the competence of the EPC contractor or contractors PCS selected.

75. As a result, Buss is suffering substantial reputational harm and diminished goodwill.

**FOURTH CAUSE OF ACTION**
**Negligent Misrepresentation**

76. Buss incorporates the allegations in the foregoing paragraphs.

77. During contract formation, PCS made certain material misrepresentations.

78. Buss suggested that PCS work with WengFu as EPC contractor based on WengFu's prior success in applying Buss's technical specifications and installing the Proprietary Equipment in AHF plants.

79. PCS declined to follow Buss's recommendation to select WengFu as EPC contractor.

80. PCS represented to Buss that it had a good selection of EPC companies with whom it had extensive experience for a project of this type.

81. PCS's representation was false; in fact, none of the EPC companies selected had extensive experience with the technology and engineering required for a project of this type.

82. PCS should have known that its representation regarding EPC companies was false at the time it made such representation.

83. PCS had special knowledge and expertise regarding the capabilities of the EPC companies within its own network—knowledge that Buss did not and could not have possessed—and in the three years leading up to the Agreement, Buss had developed a close working relationship with PCS defined by trust and confidence.

84. Based on Buss's trust and confidence in PCS, as well as Buss's understanding that PCS was uniquely positioned to know the qualifications of the EPC companies within its network, Buss relied on PCS's representation regarding EPC companies: Buss understood PCS's representation to be an assurance that the EPC contractor or contractors PCS selected would be competent and capable of working successfully with Buss's technical specifications and

Proprietary Equipment, and PCS's representation was a material factor supporting Buss's decision to contract with PCS. Buss would not have entered the Agreement with PCS without PCS's assurances regarding the competence of the EPC contractor or contractors PCS selected.

85. As a result, Buss is suffering substantial reputational harm and diminished goodwill.

**PRAYER FOR RELIEF**

WHEREFORE, Buss prays for judgment against PCS for each of the causes of action raised herein. Buss respectfully requests:

1. A judgment and declaration that (i) Buss did not breach the Agreement; (ii) PCS cancelled the Agreement for convenience; (iii) to the extent PCS is entitled to any damages (which it is not), the Agreement limits Buss's liability to 4.6 million Swiss Francs; and (iv) under the Agreement, Buss is not liable for PCS's lost profits and consequential damages;
2. A judgment that PCS breached the Agreement;
3. A judgment that PCS engaged in fraudulent misrepresentation;
4. A judgment that PCS engaged in negligent misrepresentation;
5. Monetary damages against PCS in an amount to be determined at trial;
6. Pre- and post-judgment interest;
7. Buss's costs and expenses in this litigation, including attorney's fees; and
8. Any other relief as this Court may deem just and proper.

Dated: New York, New York
May 2, 2025

GIBSON, DUNN & CRUTCHER LLP

*/s/ Christopher Belelieu*

Christopher D. Belelieu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
cbelelieu@gibsondunn.com

*Attorney for Plaintiff Buss ChemTech AG*